1
2
3
4
5
6
7

8                    UNITED STATES DISTRICT COURT

9                    EASTERN DISTRICT OF CALIFORNIA

10

11    ALBERTO ALAS HERNANDEZ,            No. 1:17-cv-00354-DAD-SKO HC

12                   Petitioner,

13        v.                            **FINDINGS AND RECOMMENDATIONS
                                         TO DENY PETITION FOR WRIT OF
14    CLARK DUCART,                      HABEAS CORPUS AND DECLINE TO
                                         ISSUE CERTIFICATE OF
15                   Defendant.          APPEALABILITY**

16                                       **(Doc. 15)**

17

18           Petitioner, Alberto Alas Hernandez, is a state prisoner proceeding with counsel with a

19    petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254.  Petitioner alleges two grounds for

20    habeas relief: (1) the police coerced his statements in violation of his Due Process Rights, and (2)

21    his sentence of 40 years to life improper.  The Court referred the matter to the Magistrate Judge

22    pursuant to 28 U.S.C. § 636(b)(1) and Local Rules 302 and 304.  Having reviewed the record as a

23    whole and applicable law, the undersigned recommends that the Court deny the habeas petition.

24

25

26

27

28

                                              1

## I.   **Factual and Procedural Background**[1]

On March 4, 2013, 18-year-old Shane Moore ("Moore") sustained a fatal gunshot wound while visiting a house in Los Baños, California.  The shooting occurred after Moore and several companions had helped friends move into the home.  At the time of the shooting, Moore was standing inside the open garage with six other people.

After completing the move, a neighbor stopped by with two other men, including Tyler Jobe ("Jobe").  While socializing with the neighbor, an unidentified man snuck up from behind a U-Haul truck parked in the driveway and discharged a gun into the garage.  The gunman fired approximately ten shots, causing a bullet to strike Moore in the chest and inflicting non-lethal injuries on three other individuals, including Jobe.

Subsequent investigation led authorities to believe the shooting was gang-related, though Moore had no gang ties.  The shooter's intended target was Jobe, who admittedly was a "Northerner," a gang member.  Jobe told investigators that he was shot by some "scraps," which the police understood to be slang for members of a rival gang known as the Sureños.  The police learned that a Sureños gang member, Juan Meza ("Meza"), lived directly across the street from the crime scene.

A break in the case occurred when police reviewed recordings of inmate telephone calls from the Merced County Jail made on the night of the shooting and two days afterward. Conversations between Christopher Aguayo ("Christopher") and his older brother, inmate Pablo Aguayo, Jr. ("Pablo") appeared to contain coded language referencing details of the crime.[2] Christopher, also known as "Little One," spoke to his brother about "Skeletor's" involvement in

---

[1] The factual background, taken from the opinion of the California Court of Appeal, Fifth Appellate District, *People v. Hernandez*, (F069377) (Cal. App. Mar. 26, 2016), is presumed to be correct.  28 U.S.C. § 2254(e)(1).

[2] Christopher and Pablo have the same surname as Petitioner; therefore, they will be referenced by their first names for the sake of clarity.

2

the crime. Pablo appeared unfamiliar with the moniker and asked if Skeletor was "Betillo." Christopher responded in the affirmative. Investigators knew that "Betillo" is a Spanish nickname for Alberto, and determined the person Christopher and Pablo were speaking about might have been Petitioner.

The police narrowed their list of suspects to Petitioner, Christopher and Meza, the man who lived across the street from the crime. These three were known to be "validated" Sureño members and part of a small local subset of the gang called "Territorial Sur Trece" or "TST." They each also lived in close geographic proximity to the crime scene.

On the morning of March 22, 2013, the police took Christopher into custody and interrogated him about the shooting. Petitioner was arrested later that afternoon.

Christopher denied responsibility for the murder, but eventually identified Petitioner as the perpetrator. He claimed Petitioner had stopped by his house on the night of the shooting before continuing to the home of Meza, aka "Tiny." There were "some people posted by Tiny's house," and Petitioner wanted Christopher to go with him. Christopher argued with Petitioner about going to Tiny's house and ultimately did not go, but allowed Petitioner to borrow his bicycle. Christopher later took police to a field near the crime scene where Petitioner had allegedly dumped the murder weapon. The field has since been plowed, and initial attempts to recover the gun were unsuccessful.

The information Christopher provided was consistent with evidence developed in the earlier stages of the investigation. A witness who lived on a neighboring street reported hearing gunshots and seeing a person on a mountain bike pedaling down the street in the direction of a field. The man remarked that he had "never seen anybody ride a bike that fast." While searching the nearby field, police found a burgundy-colored "Next" brand mountain bike, which was the same type of bicycle Christopher described loaning Petitioner. Petitioner also fit the physical profile given to police by victim Jobe – a teenaged male of Mexican descent of average height, with dark hair and

a "skinny" build. Petitioner is a Hispanic male, born September 1995,[3] whose approximate height was 5'7" and weight was 165 pounds. Christopher told police that he and others called Petitioner "Skeletor" because of his skinny frame.

Custodial interrogation of Petitioner produced a confession that corroborated Christopher's story. Petitioner admitted to being at Meza's house; shooting the victims; fleeing the scene on Christopher's bicycle; and leaving the bike at the edge of a nearby field. After Petitioner's confession, the police returned to the field with metal detectors and found a 9mm Ruger P89 semiautomatic pistol buried in the ground. Forensic analysis matched the gun to ten expended shell casings found at the crime scene.

Petitioner was prosecuted as an adult and charged with one count of murder, three counts of attempted murder, and one count of active participation in a criminal street gang. Petitioner was found guilty of second degree murder (Cal. Penal Code §§ 187(a), 189), and active participation in a criminal street gang (Cal. Penal Code § 186.22(a)). Additional gang and firearm-related enhancement allegations were found true in relation to the murder count. The trial court imposed a prison sentence of 40 years to life, with eligibility for parole after 25 years, since Petitioner was 17 years old when he committed the crimes.

The California Court of Appeal for the Fifth Appellate District ("Court of Appeal") affirmed the conviction on March 29, 2016. Petitioner filed a motion for rehearing with the Court of Appeal on April 8, 2016, which was denied on April 11, 2016. The California Supreme Court denied review on July 13, 2016.

Petitioner filed his petition with this Court on March 10, 2017. Respondent responded to the petition on July 18, 2017, and Petitioner filed a reply on September 7, 2017.

---

[3] Petitioner was 17 years old at the time of the crime, March 4, 2013.

## II.     <u>Standard of Review</u>

A person in custody as a result of the judgment of a state court may secure relief through a petition for habeas corpus if the custody violates the Constitution or laws or treaties of the United States.  28 U.S.C. § 2254(a); *Williams v. Taylor*, 529 U.S. 362, 375 (2000).  On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed thereafter.  *Lindh v. Murphy*, 521 U.S. 320, 322-23 (1997).  Under the statutory terms, the petition in this case is governed by AEDPA's provisions because it was filed April 24, 1996.

Habeas corpus is neither a substitute for a direct appeal nor a device for federal review of the merits of a guilty verdict rendered in state court.  *Jackson v. Virginia*, 443 U.S. 307, 332 n. 5 (1979) (Stevens, J., concurring).  Habeas corpus relief is intended to address only "extreme malfunctions" in state criminal justice proceedings.  *Id.*  Under AEDPA, a petitioner can obtain habeas corpus relief only if he can show that the state court's adjudication of his claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2)  resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d); *Lockyer v. Andrade*, 538 U.S. 63, 70-71 (2003); *Williams*, 529 U.S. at 413.

"By its terms, § 2254(d) bars relitigation of any claim 'adjudicated on the merits' in state court, subject only to the exceptions set forth in §§ 2254(d)(1) and (d)(2)."  *Harrington v. Richter*, 562 U.S. 86, 98 (2011).

As a threshold matter, a federal court must first determine what constitutes "clearly established Federal law, as determined by the Supreme Court of the United States."  *Lockyer*, 538 U.S. at 71.  In doing so, the Court must look to the holdings, as opposed to the dicta, of the

5

Supreme Court's decisions at the time of the relevant state-court decision. *Id.* The court must then consider whether the state court's decision was "contrary to, or involved an unreasonable application of, clearly established Federal law." *Id.* at 72. The state court need not have cited clearly established Supreme Court precedent; it is sufficient that neither the reasoning nor the result of the state court contradicts it. *Early v. Packer*, 537 U.S. 3, 8 (2002). The federal court must apply the presumption that state courts know and follow the law. *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002). The petitioner has the burden of establishing that the decision of the state court is contrary to, or involved an unreasonable application of, United States Supreme Court precedent. *Baylor v. Estelle*, 94 F.3d 1321, 1325 (9th Cir. 1996).

"A federal habeas court may not issue the writ simply because the court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Lockyer*, 538 U.S. at 75-76. "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington*, 562 U.S. at 101 (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). Thus, the AEDPA standard is difficult to satisfy since even a strong case for relief does not demonstrate that the state court's determination was unreasonable. *Harrington*, 562 U.S. at 102.

### III.    The State Court Did Not Err in Admitting Petitioner's Custodial Statements

In his first ground for habeas relief, Petitioner alleges his statements to police were involuntary because he was coerced, and therefore, should not have been admitted at trial. (Doc. 1 at 9.) Respondent counters that the trial court reasonably found Petitioner's confession was voluntary, despite the use of coercive interrogation tactics by the police. (Doc. 12 at 10.)

## A. Standard of Review

To be admissible at trial, confessions must be made voluntarily. *Lego v. Twomey*, 404 U.S. 477, 478 (1972). A statement is involuntary when a suspect's "will was overborne in such a way as to render his confession the produce of coercion." *Arizona v. Fulminante*, 499 U.S. 279, 288 (1991). To determine whether a statement is voluntary, the Court is required to consider "the totality of all the surrounding circumstances – both the characteristics of the accused and the details of the interrogation." *Dickerson v. United States*, 503 U.S. 428, 434 (2000) (quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973)). These "surrounding circumstnaces" include both "the crucial element of police coercion," but also may include "the length of the interrogation, its location, its continuity, the defendant's maturity, education, physical condition, and mental health." *Withrow v. Williams*, 507 U.S. 680, 693 (1993) (quoting *Colorado v. Connelly*, 479 U.S. 157, 167 (1986)).

## B. State Court of Appeal Opinion

At trial, Petitioner moved to suppress statements he made to the police, which the trial court denied. *People v. Hernandez*, (F069377) (Cal. App. Mar. 26, 2016), at 5. The Court of Appeal summarized the testimony at the hearing on the motion to suppress, as follows:

> [Petitioner] was arrested at his home on March 22, 2013 at approximately 3:30 pm. He was taken to a facility known as the police annex and placed in an interview room that was approximately 8 feet by 8 feet in size and furnished with a desk and three chairs. After being advised of his Miranda rights (*Miranda v. Arizona* (1996) 384 U.S. 436), [Petitioner] submitted to questioning by Detective Solis and his partner, Justin Melden.

> [Petitioner] initially professed ignorance as to why he was being interviewed. Detective Solis advised that they knew of his involvement in an "incident" from three weeks earlier, and asked [Petitioner] to be forthright in acknowledging the subject of their investigation. When [Petitioner] continued to act puzzled, the detective asked if he had read the newspaper. He replied, "Oh, yeah, I heard about it," and in response to questions regarding what he had heard, said "[S]ome people got shot. Some kids. Well, they weren't kids because they were already 18 and up . . . they were saying at La Mesa [Lane], but I don't know about where else . . . I know one got killed, but I don't know about the other ones. That's what I heard."

The detectives implored [Petitioner] to be honest and demonstrate remorse for his actions, telling him a showing of honesty and remorse was "the only way out" and "the only way that anybody will ever have any leniency on you." [Petitioner] was also told that his "boys," i.e. "Tiny" and "Little One," had identified him as the shooter. These tactics had little or no effect during the initial round of questioning, which lasted for approximately 40 minutes until a break was taken. [Petitioner] repeatedly denied having any involvement in the shooting or being present when it occurred.

Despite his denials, [Petitioner] acknowledged [his] nickname "Skeletor," explaining, "I guess they just say 'Skeletor' because I'm skinny." He also confirmed his association with Juan Meza, spontaneously referencing him by name after pretending not to know anyone named "Tiny" or "Little One" (i.e., Meza and [Christopher]). Later, shortly before the first break in questioning, [Petitioner] began to tell a story about being in Dove Park on the night of the shooting with Juan Meza and "at least 3 or 4 other people" whom he had never met. One of these individuals had been "showing off with a gun." Following the break, [Petitioner] stuck with his story for another 10 minutes, claiming the sight of the gun had prompted him to leave the park and go home.

Detective Solis accused [Petitioner] of lying about Dove Park, alleging he had reviewed the "GPS" coordinates from a tracking bracelet that Juan Meza was required to wear as a probationer, which supposedly showed Meza was not in a park on the day of the shooting. When this tactic proved unsuccessful, he urged [Petitioner] to accept his "help" and warned, "All the evidence is against you. I don't care how you put it. It's all against you. The bike that you used to get there. The gun you used to do it. The bullets. Everything." [Petitioner] apologized for lying and admitted to being at Meza's house, but did so in the process of transitioning to a new story wherein he had departed from Meza's home after learning that the people there were going to shoot somebody. He explained: "[I had been inside Meza's garage talking on the phone with my mother,] and I was already walking back in and then that's when I heard somebody was gonna be shot. And that's when I looked up and I was oh, damn, and I was like, oh well, I wanna leave. You know, I didn't have [-] I didn't want nothing to do with that. Also so I just got the bike and I just left. And then after that, that's, I just heard gunshots." In this version of events, [Petitioner] had already reached the nearby field when the shooting took place. Panicked by the sound of gunshots, he decided to abandon the bike and continue home on foot. He reasoned that police were less likely to "pull [him] over and try to do something to [him]" if he was walking as opposed to riding a bicycle.

The detectives continued to accuse [Petitioner] of lying, and (falsely) informed him that gunshot residue had been found on the bicycle, which must have been transferred there from the shooter's hands. [Petitioner] adjusted his account to reconcile it with these purported facts: "Well, I was there . . . This is what happened, alright? When that happened, [the shooter] left, and then he got on the bike, and then I guess some car picked him up, and then I just seen the bike laying there so I picked it up and got [on] it. And that's when I remembered like, wait, he just did this, so the gunpowder must be there, if he touched it, and then that's when I was leaving, then I remembered, and I started hearing the sirens, that's when I just left the bike there. And then I just left."

The second round of questioning lasted approximately 25 minutes. This was followed by a seven-minute break, during which time [Petitioner] used the bathroom and received a cup of water (water was also provided at the first break). When the interrogation resumed, [Petitioner] repeated his contentions about a

nameless culprit who had fled on a bicycle before entering a getaway vehicle.

After hearing [Petitioner's] fleeing-shooter explanation for the third time, Detective Melden said, "I'm going to ask you one, one question. Ok, 'cause there's a lot riding on this one question. OK? Did you aim at the guy [the victim, Moore], or did he walk in front of your gun? That's the question. OK? It's not anything else. Did you mean to kill the guy, the innocent one, not the gangster, or did he walk in front of your gun?" [Petitioner] replied, "I didn't mean to kill no one . . ." Detective Melden responded, "Ok, that's huge." This exchange marked something of a turning point in the interrogation. [Petitioner] began to vacillate between maintaining his innocence and characterizing the homicide as accidental, then admitted to shooting at people whom he perceived to be rival gang members and unintentionally striking the deceased victim.

Following [Petitioner's] admission of guilt, the detective focused their efforts on finding the murder weapon. When they asked where the gun was located, he said, "I don't know, somebody picked it up, I don't know who." Further questioning along the same lines produced vague and evasive answers, e.g., "[I] threw it in the bush . . . I don't know [where], it's not there . . . Somebody took it, I don't know . . . It's lost . . . I left it at the park. And then somebody went to go pick it up." Detective Solis grew frustrated with these responses and took a more aggressive approach, essentially threatening to cause [Petitioner's] fellow gang members to turn against him if he did not cooperate:

> "What I'm going to do, what we're gonna do right after [this] is we're gonna check your phone records. And the person you called, all those people, every single homey you called, I'm gonna knock their door downs (sic). And I'm gonna tell 'em you sent me there. Because that's all you're gonna get, that's what you're doing. Now you're pissing me off. And you're gonna lead me to all of your homeys' house and that puts you in a very tough spot. Not only, if you want to take the fall for this shit you did, your homeys won't understand that, you weren't mad about it, but when you made the cops go to their house and knock their shit down and find their guns and find their dope, and find all their shit? Now they're gonna be pissed off at you. You see what you're doing here? 'Cause I'm gonna go through all of your records. Through your mom's through your dad's, through everyone that was involved with you and is connected with you. We're gonna find that gun. . .

> . . . [I'm going to] knock every homey's front door down. Everybody already knows who it is. He knows who it is. You know, I'm not gonna be going over there and play with them. I'll just start taking people to jail. And you're gonna be one hated motherfucker, I'll tell you that right now. If you keep fucking playing these games with me. I want that gun and I want it now. Stop feeding me lies. And stop being vague with me. Where's the gun?

As the detectives pressed him about the gun, [Petitioner] made requests to see his family. Detective Melden told him, "We talked to our boss. OK? And we, I – we think we can work something out with that, OK? The problem is, is that we have to have, I – we gotta have that gun, man. OK? We gotta have that gun, dude. You know where you put that gun? We need it back, man. There's no reason to keep it. There's no reason to hide it at this point. OK? We need that gun back, to make sure nobody else gets hurt." Despite the detectives' efforts, [Petitioner] did not provide further information about the gun. He maintained that it had been discarded

in an unspecified park and retrieved by an unknown individual.

The detectives eventually gave up on the gun inquiries and asked [Petitioner] to provide a complete summary of the crime. The following exchange segued into the final stage of the interrogation:

Melden:        I wanna know, from the beginning to the end, the [truth], what happened that day. From the beginning to the end. OK? I'm not opposed to letting you see your family. OK? I don't think that, that's too bad of an issue. You're gonna go to jail tonight. But before we go to jail, I think we could have you down and they could say hi to you, and give you a hug, all that stuff. That being said, I'm not unreasonable. But I need to know the truth from the beginning to the end. OK? Because as I'm treating you with respect, I need respect back. You understand?

Solis:         And don't start-, don't come at us with, I was with the homeys, but this other homey walked up, I wanna know whose house you went to, what they told you when, when you wanna do something, how you got there, how you went back –

[Petitioner]:  I never went to no one.

Solis:         – all of it.

Melden:        Go ahead. Start from the beginning. Go ahead. I'm gonna keep notes so that the shit makes sense. 'Cause this time it's gonna be the truth. It's all out on the table. It's already out there, so don't bullshit, don't hide anything, 'cause –

Solis:         For your, for your family.

Melden:        Let's go.

Solis:         They're the only ones that matter.

[Petitioner]:  When am I going to see them? Actually –

Solis:         As soon as we get damned truth from you!

[Petitioner]:  Yeah, but I should be with them.

Melden:        That goes to the, the court. The court and all that shit goes. Tell you what, you being honest with us, will go a long ways for you. It really does. It helps you out, because it makes you look like a human being.

Solis:         Because here's the thing –

Melden:        These fucking monsters are born every minute, man.

Solis:         But you're gonna be charged. Right? You understand that, right? You're gonna be charged. One way or the other. What's up to you is, how long do you want to wait for your

family?  Murderers and monsters belong in jail.  Remorse – remorseful people, the people that want to be with their family, and show proof that they want to be with their family, go home to their family.  Fine –

Melden:   You got to pay for what you did, man.  You got to.  There's not excuse about that.  You got to pay for what you did.  Right?

[Petitioner]:   Am I gonna get life?

Melden:   I don't know what you're gonna get, man.  Alright?  I don't know.

Solis:   We don't –, we don't impose the time.

Melden:   I have no idea what you're gonna get.  But I do know what, you're a young man –

[Petitioner]:   That's the problem –

Melden:   You're a young man.  You said what it, it –, you were, you were, it was a mistake.  I just want to hear your story of this.  OK?  Let me hear it.

[Petitioner]:   Well, I just, it just happened.  I just gone over there and it happened.

[Petitioner] went on to make the same admissions as before, this time adding that he had stopped at [Christopher's] house to get the bicycle before arriving at the eventual crime scene.  Detective Melden thereafter engaged [Petitioner] in what the trial court characterized as quid pro quo bargaining, more or less offering to allow [Petitioner] a visit with his family in exchange for an apology letter.  [Petitioner] agreed, and drafted a letter to the decedent's family while sitting alone in the interview room.  The letter read as follows:

"I'm sorry for doing what I did.  I didn't mean to do this.  It just happened to get in the way.  I'm really sorry.  If I could take it back, if I could go back in time I would change things.  I got a kid on the way.  I got my family.  I know how you feel.  I'm sorry.  I hope I'll get to see my family one day, they mean everything to me.  I know I fucked up.  This is just killing me.  I hope you guys forgive me.  I was already getting my life together since before it happened.  I was going to go to college.  My girlfriend is pregnant.  I need to be with her.  I'm so sorry for this.  Damn, I wish this was just a dream.  I got a whole life ahead of me.  I really hope you guys forgive me.  I hope to get out one day to be with my family once again.  I regret doing this.  I'm really sorry.  Sincerely, Alberto Alas Hernandez."

As promised, [Petitioner] was allowed to visit with his mother and girlfriend inside of the interview room.  These events were also captured on video.  The footage shows [his] mother, speaking in Spanish, say, "They are accusing you?  Did you do it?  Look tell me the truth [. . .] tell me the truth, did you do it?"  [Petitioner] responds with a slight nod, and she reacts by pointing at him and saying, "Yes?  Why Beto?"  [Petitioner] shakes his head, seeming to indicate he has no explanation, and repeats the gesture when she asks why he would hurt people.

The trial court issued an 11-page order denying the motion to suppress [Petitioner's] custodial statements, including his letter of apology. The order contains a detailed totality-of-the-circumstances analysis regarding the objective circumstances of the interrogation and the various techniques employed by the detectives. The court found, inter alia, that although the interview room was small, it was well lit and provided adequate space between [Petitioner] and the detectives ("There is nothing about the physical characteristics of the room, its furnishings[,] or the position of the interrogators that was psychologically coercive.") [Petitioner's] juvenile status at the time of questioning was given due consideration, as were the competing factors of his prior experience with the criminal justice system (he was a ward of the court and had previously been interrogated by Detective Solis as a suspect in a gang-related stabbing), his apparent level of intelligence, and his remarkably calm demeanor throughout the interrogation.

The detectives' use of deception and "trickery," i.e., false claims of eyewitness identifications and physical evidence tying [Petitioner] to the scene, was deemed unlikely to produce a false confession and thus permissible. These techniques were seen as having spawned implausible stories of third party culpability, not admissions of guilt. The trial court faulted the detectives for implying that truthful disclosures would result in some type of leniency for [Petitioner], but found "there was no causal connection between the officers making these statements and defendant making an incriminating statement." Several factors were cited in support of this conclusion, including [Petitioner's] persistent denials and claims of innocence in response to the implied promises. The trial court found the admissions of guilt were motivated by a combination of [Petitioner] realizing the "illogical and incredulity" of his changing story, and a desire to "minimize his culpability by minimizing the killing." The court further ruled that although the apology letter "was the result of quid pro quo proposal," the statements therein were made voluntarily.

*Id.* at 6-14.

After summarizing the testimony from the hearing on the motion to suppress, the Court of Appeal analyzed whether Petitioner's statements to the police officers were made voluntarily. The Court of Appeal found Petitioner's statements were made voluntarily:

The federal and California state Constitutions require prosecutors to establish, by a preponderance of evidence, that a defendant's confession was voluntarily made. (*People v. Boyette* (2002) 29 Cal.4th 381, 411 (*Boyette*).) "The test for the voluntariness of a custodial voluntariness of a custodial statement is whether the statement is "'the product of an essentially free and unconstrained choice'" or whether the defendant's "'will has been overborne and his capacity for self-determination critically impaired'" by coercion." (*People v. Cunningham* (2015) 61 Cal.4th 609, 642 (*Cunningham*).) In making this assessment courts must evaluate "the totality of all the surrounding circumstances – both the characteristics of the accused and the details of the interrogation." (*Schneckloth v. Bustamonte* (1973) 412 U.S. 218, 226 (*Schneckloth*).) Relevant "characteristics of the accused" include the defendant's age, maturity, education, intelligence, mental health, and physical condition at the time of the interrogation. (*Id.* at p. 226; *Boyette, supra,* 29 Cal.4th at p. 411.) Relevant "details of the interrogation" include the location, length, the nature of the questioning (such as aggressive, repeated, or prolonged questioning), the use of physical force or deprivation of food or sleep, and the lack

of advice as to the defendant's constitutional rights. (*Schneckloth*, *supra*, 412 U.S. at p. 226; *People v. Carrington* (2009) 47 Cal.4th 145, 175 (*Carrington*); *Boyette*, *supra*, 29 Cal.4th at p. 411.)

A ruling on the voluntary or involuntary nature of a confession is largely subject to de novo review on appeal. The trial court's findings as to the characteristics of the accused and the details of the interrogation are generally factual and thus reviewed for substantial evidence. (*People v. Bensen* (1990) 52 Cal.3d 754, 779.) The ultimate issue of voluntariness is a question of law. (Ibid.) "Where, as was the case here, an interview is recorded, the facts surrounding the admission or confession are undisputed and we may apply independent review." (*People v. Duff* (2004) 58 Cal.4th 527, 551.)

We agree with the trial court's overall assessment of [Petitioner] and the circumstances under which he was interrogated. His age on the date of questioning was 17 years and six months. He was in his senior year of high school and apparently on pace to graduate, with self-reported plans to attend college. Academic records showed a positive trend from underachievement to above-average grades. We have no doubts as to appellant's intelligence; he displayed cunning and mental agility in parrying the detectives' questions throughout the interrogation.

[Petitioner] appeared to be in good health and showed no outward signs of distress or disorientation. As noted, he remained calm and confident during the entire process, revealing little emotion until after the interview was over. He was neither gullible nor easily intimidated, as evidenced by his refusal to succumb to Detective Solis's pressure tactics with respect to the murder weapon. [Petitioner] also expressed distrust and skepticism, even after he had admitted guilt (e.g., "I'm gonna go away anyways"; "I just think you guys are lying"; "I don't think I'm gonna see [my family] again").

The "relevant details of the interrogation" were within acceptable standards. Although the interview room was small, it provided adequate space for the three occupants. The detectives refrained from acts of physical intimidation and mostly spoke in conversational tones. [Petitioner] had been interrogated by Detective Solis at the same facility on a prior occasion, so the experience was not entirely foreign to him. He was required to keep his hands cuffed in front of him during questioning, but Detective Melden loosened the restraints upon request to ease his discomfort.

The interrogation was not particularly lengthy. The record reflects that the actual question-and-answer session lasted approximately 2 hours and 10 minutes, not including four breaks taken in the interim. Next came preparation of the apology letter, followed by a few intermittent conversations pending the arrival of [Petitioner's] mother and girlfriend. [Petitioner] began to incriminate himself ("I didn't mean to kill no one") after approximately 1 hour and 20 minutes of questioning.

Turning to the challenged interrogation techniques, the issue is whether any material admissions were "extracted by threats or violence, obtained by direct or implied promises, or secured by the exertion of improper influence." (*People v. Maury* (2003) 30 Cal.4th 342, 404 (*Maury*).) We believe Detective Solis went too far by threatening to kick down the doors of gang members' homes, seize any contraband found inside, make arrests, and blame it all on [Petitioner] unless he disclosed the location of the gun. The clear implication was that [Petitioner] would suffer retribution, likely in the form of violence, unless he disclosed certain

information. However, "[c]oercive police tactics by themselves do not render a defendant's statements involuntary if the defendant's free will was not in fact overborne by the coercion . . ." (*People v. Rundle* (2008) 43 Cal.4th 76, 114, disapproved on another point in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22.) "A confession is involuntary only if the coercive police conduct at issue and the defendant's statement are casually related." (*Cunningham, supra*, 61 Cal.4th at p. 643.) The causal connection is missing here because (1) [Petitioner] had already taken responsibility for the shooting before Detective Solis pressed him about the gun, and (2) the coercive tactics did not cause him to change his answers regarding the gun's whereabouts.

[Petitioner] renews his earlier objections to the detectives' use of deception and misinformation. We are not persuaded by those arguments. "Lies told by the police to a suspect under questioning can affect the voluntariness of an ensuing confession, but they are not per se sufficient to make it involuntary." (*People v. Musselwhite* (1998) 17 Cal.4th 1216, 1240 (*Musselwhite*).) "The use of deceptive statements during an investigation does not invalidate a confession as involuntary unless the deception is the type likely to procure an untrue statement." (*People v. McCurdy* (2014) 59 Cal.4th 1063, 1088.) In other words, "there must be a *proximate* causal connection between the deception or subterfuge and the confession." (*Musselwhite, supra* 17 Cal. 4th at p. 1240.) At worst, the subterfuge of which [Petitioner] complains led him to offer dubious tales of innocence rather than admissions of guilt.

*Id*. at 14-18.

Although the Court of Appeal did not find the questioning resulted in an involuntary statement from Petitioner, it did find the officers made express and/or implied promises of lenient treatment:

The one form of deception that is categorically prohibited is a false promise of leniency. (*People v. Cahill* (1994) 22 Cal.App.4th 296, 315.) "Since threats of harsh penalty often contain an implicit promise of more lenient treatment, they are treated as promises of leniency." (*Id*. at p. 311.) As with other forms of coercion, a promise of leniency does not render a subsequent confession involuntary unless it is the "motivating cause" of the defendant's admissions. (*People v. Linton* (2013) 56 Cal.4th 1146, 1176-1177 (*Linton*); *People v. Williams* (1997) 16 Cal.4th 635, 660-661 [rejecting the view that an offer of leniency necessarily renders a statement involuntary].) "'This rule raises two separate questions: was a promise of leniency either expressly made or implied, and if so, did that promise motivate the subject to speak?'" (*People v. Tully* (2012) 54 Cal.4th 952, 986.)

[Petitioner] carries his burden of showing there were expresses and/or implied promises of lenient treatment in exchange for honesty. Detective Melden explicitly said, "The only way out is the truth. That's the only way that anybody will ever have any leniency on you." On another occasion, Detective Solis told [Petitioner], "When we present things to a district attorney, we say, 'Here's what we have. Here's the evidence we have. He didn't want to say anything. He denied it. But we proved he did it.' On the other hand [indicating with right hand], here's what we have: 'He worked with us. He was apologetic. He regretted it. He understands he fucked up in life.' On this one [indicating first scenario], they're just gonna throw the book at you. Over here [indicating with right hand], they're going to be

like[,] 'Mm, well he fucked up. Let's go see what we can do with the guy. What does he want to do to help himself? And they consider all that."

The two examples we have cited occurred during the initial round of questioning. Later, Detective Melden made a reference to [Petitioner's] unborn child (his girlfriend was present), saying, "That kid will never see you, you keep lying. That kid will never see you." [Petitioner] nevertheless maintained his innocence and told three different versions of events before finally admitting guilt. Continuing to deny responsibility in the face of the detectives' express and implied promises shows an absence of the required casual effect. (*People v. Williams* (2010) 49 Cal.4th 405, 444; *People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 58 ["His resistance, far from reflecting a will overborne by official coercion, suggests instead a still operative ability to calculate his self-interest in choosing whether to disclose or withhold information."]; cf. *People v. Perez* (2016) 243 Cal.App.4th 863, 876-877 [causation found where defendant incriminated himself "immediately after" police promised that if he cooperated and told the truth, he would not be charged].) [Petitioner's] evasive responses to the gun questions after conceding his role in the crime bolsters the conclusion that his capacity to make self-interested decisions remained intact despite the detectives' improper behavior.

The trial court was correct in determining that the motivating cause of [Petitioner's] admissions was a combination of him realizing that his story had become unbelievable, and concluding the "accident" narrative made him appear less culpable. Detective Melden had repeatedly expressed a willingness to believe the victim's death was unintentional, but such assurances were not illegal. A detective's "suggestions that the killing[ ] might have been accidental . . . and that such circumstances could 'make[ ] a lot of difference,' fall far short of being promises of lenient treatment in exchange for cooperation." (*People v. Holloway* (2004) 33 Cal.4th 96, 116; accord, *Carrington*, *supra*, 47 Cal.4th at p. 171 [detective's suggestions that homicide was accidental "merely suggested possible explanations of the events and offered defendant an opportunity to provide the details of the crime. This tactic is permissible."].)

. . .

[Petitioner] first spoke of wanting to see his family after expressing that he never intended to kill anybody. Detective Melden asked if he wished to apologize to the family of the deceased victim, and [Petitioner] replied, "I just want to see my family, you know." [Petitioner] made additional incriminating statements before inquiring, "Well my question is, will I see my family?" Detective Melden responded, "Oh yeah, I'm sure you'll see them again. I'm sure you will." [Petitioner] said "no" and continued to implicate himself in the shooting. His insistence upon seeing his family did not occur until towards the end of the interview, during and after questioning about the gun.

The detectives' quid pro quo overtures in the final state of the interrogation were improper and tainted the admissibility of the apology letter. The trial court recognized the letter "was the result of a quid pro quo proposal," but focused on the lack of external input as to the actual contents of the writing ("There was nothing on the [video] to indicate that any officer was present to suggest what the content, length, or style of the letter should be."). The dispositive inquiry is whether an improper promise or exertion of influence was the motivating cause for the statement at issue. That being said, the erroneous admission of the apology letter was clearly harmless. (*People v. Cahill* (1993) 5 Cal.4th 478, 509-510 [admission of involuntary confession subject to harmless error analysis under the standard

15

enunciated in *Chapman v. California* (1967) 386 U.S. 18].) The letter contained only a generalized concession of wrongdoing and focused on [Petitioner's] concern for his own future. This evidence was superfluous to the admissions made during the interrogation and less probative of his guilt. The footage of him acknowledging responsibility for the crime to his mother, which was shown to the jury, was arguably more compelling than the letter.

The record demonstrates, by a preponderance of evidence and under the totality of the circumstances, that [Petitioner's] incriminating statements during custodial interrogation were voluntary. Any error in the admission of evidence concerning the letter of apology was harmless, i.e., it is evident beyond a reasonable doubt that the jury's verdict would have been the same had proof of the letter and its contents been excluded. We find no cause for reversal based on the use of [Petitioner's] custodial statements at trial.

*Id*. at 18-21.

### C. Denial of Petitioner's Due Process Claim Was Not Objectively Unreasonable

Petitioner alleges three grounds for his claim that the trial court erred in admitting his statements to the police: (1) his statements were the product of coercion; (2) the police made promises of leniency in exchange for his statements; and (3) Petitioner's apology letter was written in exchange for a visit from his family.

### 1. Coercion

Petitioner first argues that the threat of physical violence Detective Solis ("Solis") made during the interrogation rendered the confession involuntary, because it was the product of coercion. (Doc. 1 at 24.)

While interrogating Petitioner about where Petitioner left the gun used in the crime, Detective Solis ("Solis") told Petitioner:

What I'm going to do, what we're gonna do right after [this] is we're gonna check your phone records. And the person you called, all those people, every single homey you called, I'm gonna knock their door downs (sic). And I'm gonna tell 'em you sent me there. Because that's all you're gonna get, that's what you're doing. Now you're pissing me off. And you're gonna lead me to all of your homeys' house and that puts you in a very tough spot. Not only, if you want to take the fall for this shit you did, your homeys won't understand that, you weren't mad about it, but when you made the cops go to their house and knock their shit down and find their guns and find their dope, and find all their shit? Now they're gonna be pissed off at you. You see what you're doing here? 'Cause I'm gonna go through all of your records. Through your mom's through your dad's, through everyone that was involved with you and is connected with you. We're gonna find that gun.

16

. . .

. . . [I'm going to] knock every homey's front door down. Everybody already knows who it is. He knows who it is. You know, I'm not gonna be going over there and play with them. I'll just start taking people to jail. And you're gonna be one hated motherfucker, I'll tell you that right now. If you keep fucking playing these games with me. I want that gun and I want it now. Stop feeding me lies. And stop being vague with me. Where's the gun?

*Hernandez*, (F069377), at 9.

The Court of Appeal found that Solis "went too far by threatening to kick down the doors of gang members' homes, seize any contraband found inside, make arrests, and blame it all on [Petitioner] unless he disclosed the location of the gun." *Id*. at 17. Although the Court of Appeal found Solis' statements to be coercive, it determined that the statements did not render Petitioner's confession involuntary. The Court reasoned: "(1) [Petitioner] had already taken responsibility for the shooting before Detective Solis pressed him about the gun, and (2) the coercive tactics did not cause him to change his answers regarding the gun's whereabouts." *Id*.

The Due Process Clause prohibits "certain interrogation techniques, either in isolation or as applied to the unique characteristics of a particular suspect, [which] are so offensive to a civilized system of justice that they must be condemned." *Colorado v. Connelly*, 479 U.S. 157, 163 (1986) (quoting *Miller v. Fenton*, 474 U.S. 477, 478 (1985)). A statement is considered involuntary if it was coerced. *Fulminante*, 499 U.S. at 288.

Solis threatened Petitioner when he stated he would kick down the doors of gang members' homes if Petitioner did not disclose the location of the gun he used in the crimes. However, as the Court of Appeal noted, this threat did not coerce Petitioner to confess to the crime. Petitioner had already confessed to the crime, and Solis was attempting to locate the gun when he threatened Petitioner. Consequently, Solis' coercive tactics did not render Petitioner's confession involuntary.

Petitioner alleges the detectives induced Petitioner to give the detectives' version of events, rather than his own version of events, citing to *United States v. Preston*, 751 F.3d 1008 (9th Cir. 2014). In *Preston*, the Ninth Circuit found a petitioner's statements to police were not voluntary, based on the petitioner's

> severe intellectual impairment; the police's repetitive questioning and the threats that it would continue without end; the pressure placed on [petitioner] to adopt certain responses; the use of alternative questions that assumed his culpability; the officer's multiple deceptions about how the statement would be used; the suggestive questioning that provided details of the alleged crime; and the false promises of leniency and confidentiality.

*Id.* at 1027-28. The Court stated, "[w]e must be mindful to protect the constitutional rights of all members of our society, not just those of normal intelligence and cognitive functioning." *Id.* at 1028.

*Preston* is distinguishable, as here, there are no allegations that was physically or intellectually disabled. Petitioner told police that he was a senior that was going to graduate from high school and would be attending college. The *Preston* court determined that police tactics, similar to ones used in the case at bar, rendered defendant's confession involuntary. However, the *Preston* court emphasized, "[e]ven if we would reach a different conclusion regarding someone of normal intelligence," it was "the officers' use of methods employed [in the case] to confuse and compel a question from the intellectually disabled eighteen-year-old before us [that] produced an involuntary confession." *Id.* In sum, the distinguishing characteristic in *Preston* was the defendant's intellectual impairment, not the police officers' interrogation methods.

Finally, Petitioner contends the detectives coerced him into confessing by falsely telling Petitioner there was gunshot residue on the bicycle he rode, which implicated him in the shooting. Misrepresenting or exaggerating the amount of evidence against a criminal defendant does not create deception that rises to the level of a constitutional violation. *See Amaya-Ruiz*, 121 F.3d 486, 495 (9th Cir. 1997) ("[m]isrepresentations linking a suspect to a crime or statements which inflate

the extent of evidence against a suspect do not necessarily render a confession involuntary"),
*overruled on other grounds United States v. Preston*, 751 F.3d 1008 (9th Cir. 2014).

Petitioner initially told detectives that he "heard somebody was gonna be shot. And that's when I looked up and I was, oh, damn, and I was like, oh well, I wanna leave. . . . And so I just got the bike and I just left." *Hernandez*, (F069377), at 7. After the detectives told Petitioner there was gunshot residue on the bike, Petitioner changed his story. Petitioner stated a person whose name he did not know shot the individuals, then the shooter

> left, and then he got on the bike, and then I guess some car picked him up, and then I just seen the bike laying there so I picked it up and got it. And that's when I remembered like, wait, he just did this, so the gunpowder must be there, if he touched it, and then that's when I was leaving, then I remembered, and I started hearing the sirens, that's when I left the boke there. And then I just left.

(Clerk's Transcript Vol. 2 at 333.)

When confronted with the fake gunpowder evidence, Petitioner did not confess to the crime, but instead, simply changed his story. Petitioner did not confess to being the shooter until later in the interview, consequently, the misrepresentation did not coerce Petitioner into making an involuntary statement. In sum, while the detectives misrepresented the evidence against Petitioner, the misrepresentation did not render his confession involuntary.

Based on the foregoing, the Court of Appeal's finding that Petitioner was not coerced into confessing to the shooting was not objectively unreasonable.

## 2. Promises of Leniency

Petitioner next argues that while the Court of Appeal correctly found the police used express and/or implied promises of leniency in exchange for "honesty," the Court of Appeal incorrectly found no causal connection between the promises and Petitioner's confession. (Doc. 1 at 20-27.) Petitioner was interrogated by Solis and Detective Melden ("Melden"). The officers promised Petitioner leniency, if he told them the truth. Specifically,

Detective Melden explicitly said, "The only way out is the truth. That's the only way that anybody will ever have any leniency on you." On another occasion, Detective Solis told [Petitioner], "When we present things to a district attorney, we say, 'Here's what we have. Here's the evidence we have. He didn't want to say anything. He denied it. But we proved he did it.' On the other hand [indicating with right hand], here's what we have: 'He worked with us. He was apologetic. He regretted it. He understands he fucked up in life.' On this one [indicating first scenario], they're just gonna throw the book at you. Over here [indicating with right hand], they're going to be like[,] 'Mm, well he fucked up. Let's go see what we can do with the guy. What does he want to do to help himself? And they consider all that."

*Hernandez*, (F069377), at 18.

"A confession is involuntary if coerced either by physical intimidation or psychological pressure." *United States v. Haswood*, 350 F.3d 1024, 1027 (9th Cir. 2003). A confession cannot be extracted "by any sort of threats or violence, nor . . . by and direct or implied promises, however slight, nor by the exertion of any improper influence." *Hutto v. Ross*, 429 U.S. 28, 30 (1976) (quoting *Bram v. United States*, 168 U.S. 532, 542-43) (internal quotation marks omitted)). False promises or threats may render confession invalid. *Lynum v. Illinois*, 372 U.S. 528, 534 (1963). However, "misrepresentations made by law enforcement in obtaining a statement, while reprehensible, do[ ] not necessarily constitute coercive conduct." *Pollard v. Galaza*, 290 F.ed 1030, 1034 (2002) (citing *United States v. Orso*, 266 F.3d 1030, 1039 (9th Cir. 2001)). Neither encouraging a suspect to tell the truth, nor reciting potential penalties or sentences is coercive. *Amaya-Ruiz*, 121 F.3d at 494; *Haswood*, 350 F.3d at 1029.

Any "promise" by the officers during the interrogation must be weighed in the totality of the circumstances. *Preston*, 751 F.3d at 1017. A "promise must be sufficiently compelling to overbear the suspect's will in light of all attendant circumstances." *United States v. Guerrero*, 847 F.2d 1363, 1366 (9th Cir. 1988). The Ninth Circuit has held that an officer's promise to inform the prosecutor about a suspect's cooperation and to recommend leniency was insufficient to render a confession involuntary. *Id*. at 1363; *see also United States v. Harrison*, 34 F.3d 886, 891 (9th Cir. 1994) ("[I]n most circumstances, speculation that cooperation will benefit the defendant or even

promises to recommend leniency are not sufficiently compelling to overbear a defendant's will.") (internal citation omitted).

Based on the statements made by the officers, the Court of Appeal found that "[Petitioner] carrie[d] his burden of showing there were express and/or implied promises of lenient treatment in exchange for honesty." *Id*. However, the Court of Appeal ultimately found his confession was not involuntary, because "the motivating cause of [Petitioner's] admissions was a combination of him realizing that his story had become unbelievable, and concluding the 'accident' narrative made him appear less culpable." *Hernandez*, (F069377), at 19.

This Court's review of the record does not lead it to a contrary conclusion. Here, the detectives told Petitioner that "the only way that anybody will ever have any leniency on" Petitioner is if he told the truth. *Id*. at 18. The Ninth Circuit has held "that the police generally may offer to tell the prosecutor about the defendant's cooperation and suggest that cooperation may increase the likelihood of a more lenient sentence." *Harrison*, 34 F.3d at 891 (internal citations omitted).

Petitioner compares the case at bar to *Doody v. Ryan*, 649 F.3d 986 (9th Cir. 2011). In *Doody*, the Ninth Circuit found a 17 year old's confessions were involuntary "in light of the audiotapes that reflect the relentless, nearly thirteen-hour interrogation of a sleep-deprived juvenile by a tag team of detectives." *Id*. at 1023. *Doody* is distinguishable from the case at bar, even though both Doody and Petitioner were 17 years old at the time of their interrogations.

Although Petitioner was 17 years old, this interrogation was not Petitioner's first. Indeed, he had been interrogated by Solis at the same facility on a prior occasion. Petitioner was a senior in high school and stated that he was going to graduate and attend college. Therefore, there is no suggestion that his education or intelligence made him susceptible to coercion. Petitioner never complained of any physical ailments. The length of the questioning was not prolonged; it was approximately 2 hours and 10 minutes, including breaks.

Taken as a whole, the totality of the circumstances supports the Court of Appeal's conclusion that Petitioner's statements were not coerced by promises of leniency.

### 3. **Apology Letter**

Finally, Petitioner maintains the apology letter he wrote to the shooting victims' family should not have been admitted as he wrote it in exchange for being able to see his family. (Doc. 1 at 22.) The Court of Appeal agreed that "[t]he detectives' quid pro quo overtures in the final state of the interrogation were improper and tainted the admissibility of the apology letter." *Hernandez*, (F069377), at 20. However, the Court of Appeal found the "erroneous admission of the apology letter was clearly harmless," because the "evidence was superfluous to the admissions made during the interrogation and less probative of his guilt." *Id*. at 20-21.

When an involuntary statement is admitted at trial, the reviewing court must apply a harmless error analysis, and evaluate the trial court's error "in the context of other evidence presented in order to determine whether its admission was harmless beyond a reasonable doubt." *Fulminante*, 499 U.S. at 308. The standard that is applied is whether the error had a substantial and injurious effect or influence in determining the jury's verdict. *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993).

In the letter, Petitioner wrote:

> I'm sorry for doing what I did. I didn't mean to do this. It just happened to get in the way. I'm really sorry. If I could take it back, if I could go back in time I would change things. I got a kid on the way. I got my family. I know how you feel. I'm sorry. I hope I'll get to see my family one day, they mean everything to me. I know I fucked up. This is just killing me. I hope you guys forgive me. I was already getting my life together since before it happened. I was going to go to college. My girlfriend is pregnant. I need to be with her. I'm so sorry for this. Damn, I wish this was just a dream. I got a whole life ahead of me. I really hope you guys forgive me. I hope to get out one day to be with my family once again. I regret doing this. I'm really sorry. Sincerely, Alberto Alas Hernandez.

*Hernandez*, (F069377), at 12.

Under federal habeas review, habeas relief cannot be granted absent a "substantial and injurious effect" on the verdict. *Brecht*, 507 U.S. at 637 (quoting *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)). When a state court finds harmless error, this Court must determine whether the finding was objectively unreasonable. *Davis v. Ayala*, 135 S.Ct. 2187, 2198 (2015). Considering all the evidence admitted at trial, including Petitioner's confession, the Court cannot say the admission of the letter had a substantial or injurious effect or influence on the jury's verdict. Petitioner does not admit any more in the letter than he admitted to the detectives in his confession. Any error by the trial court in admitting the letter Petitioner wrote to the victim's family was harmless.

Petitioner asserts that the Court of Appeal's harmless error analysis was based on evidence not admitted at trial. The Court of Appeal held, "[t]he footage of [Petitioner] acknowledging responsibility for the crime to his mother, which was shown to the jury, was arguably more compelling than the letter." *Id*. at 21. Petitioner maintains the jury did not see the tape of Petitioner with his mother and "[w]ithout that additional information, the overall strength of the state's case, without the apology letter, is reduced, and the effect of the improper apology letter is enhanced." (Doc. 1 at 28.)

Petitioner's argument is unavailing given Petitioner's confession to the crime. Although the Court of Appeal acknowledged the letter was improperly admitted, the Court cannot say that the letter had a substantial or injurious effect or influence on the jury's verdict; therefore, the Court recommends denying Petitioner's claim.

Based upon the record in this case, the determination of the Court of Appeal that Petitioner's statements were voluntary is not contrary to, or an unreasonable application of, federal law. Nor is it based on an unreasonable determination of the facts in light of the evidence. For these reasons, the Court recommends denying Petitioner's claim.

**IV.  The State Court Did Not Err in Denying Petitioner's Cruel and Unusual Punishment Claim**

In his second ground for relief, Petitioner claims his sentence of 40 years to life violates the constitutional guarantee against cruel and unusual punishment, because he was a juvenile at the time he committed the crime.  (Doc. 1 at 36-38.)  Respondent counters the claim is unexhausted, and should be rejected because it does not state a federal claim.  (Doc. 12 at 21.)

A.  **Standard of Review**

"Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted."  U.S. Const., amend. VIII.  Courts determine whether punishment is cruel or unusual by looking beyond historical conceptions to "the evolving standards of decency that mark the progress of a maturing society."  *Estelle v. Gamble*, 429 U.S. 97, 102 (1976) (quoting *Trop v. Dulles*, 356 U.S. 86, 101 (1958)).

Whether a sentence violates the Eighth Amendment's prohibition of cruel and unusual punishment requires the court to determine whether the term is grossly disproportionate to the offense.  *Lockyer*, 538 U.S. at 72.  What constitutes a grossly disproportionate sentence is unclear.  *Id.*  "[T]he only relevant clearly established law amenable to the 'contrary to' or 'unreasonable application of' framework is the gross disproportionality principle, the precise contours of which are unclear, applicable only in the 'exceedingly rare' and 'extreme' case."  *Id.* at 73.  Successful challenges based on disproportionality are "exceedingly rare."  *Solem v. Helm*, 463 U.S. 277, 289-90 (1983).

In 2012, the United States Supreme Court held mandatory life without parole sentences for juvenile homicide offenders under the age of 18 violates the Eighth Amendment's prohibition on cruel and unusual punishments.  *Miller v. Alabama*, 567 U.S. 460, 479 (2012).  The Court found that, "[b]y making youth (and all that accompanies it) irrelevant to imposition of that harshest prison sentence," mandatory life without parole, "poses too great a risk of disproportionate punishment."

*Id.* The Court did not, however, foreclose, a sentencing court's ability to impose life without parole on a juvenile homicide defendant, but held the sentence must "take into account how children are different, and how those differences counsel against irrevocably sentencing them to a lifetime in prison." *Id.*

In response to *Miller*, California enacted Senate Bills 260 and 261. (Cal. Penal Code § 3051). Under those laws, a person convicted of an offense committed before the age of 23 who received a sentence of 25 years or less "shall be eligible for release on parole by the board during his or her 20th year of incarceration at a youth offender parole hearing." (Cal. Penal Code § 3051(b)(2)). The parole hearing "shall provide for a meaningful opportunity to obtain release." (Cal. Penal Code § 3051(e)). Consistent with *Miller*, if the Board of Parole Hearings uses "psychological evaluations and risk assessment instruments" to aid its decision-making, then those evaluations and instruments "shall take into consideration the diminished culpability of juveniles as compared to that of adults, the hallmark features of youth, and any subsequent growth and increased maturity of the individual." (Cal. Penal Code § 30519f)(1)).

The California Supreme Court held that California Penal Code § 3051 applies retroactively to eligible juvenile offenders. *People v. Franklin*, 63 Cal.4th 261(2016). In *Franklin*, the Supreme Court found that because the defendant committed his offense before age 18, §3051 applied. *Id.* However, because the defendant was eligible for parole after 25 years in prison, at age 41, the Supreme Court held the defendant was not serving the functional equivalent of life without the possibility of parole and thus *Miller* did not apply. *Id.*

Recently, the Ninth Circuit addressed the California Supreme Court's holding in *Franklin*. *Demirdjian v. Gipson*, 832 F.3d 1060 (9th Cir. 2016). The petitioner in *Demirdjian* was 15 years old when he was convicted of murdering two boys and sentenced to two consecutive terms of 25 years to life. *Id.* at 1065. On appeal, petitioner argued the sentenced violated the Eight

Amendment, because he was a juvenile at the time he committed the crime. *Id*. The Court of appeal affirmed the conviction, finding that no United States Supreme Court precedent barred the sentence. *Id*. Subsequently, the Ninth Circuit held that the Court of Appeal's decision was not contrary to clearly established Supreme Court authority because *Miller* was not decided until 2012, and because petitioner's sentence, for which he would be eligible for parole at age 66, was not the "functional equivalent" of a life without parole sentence. *Id*. at 1076, 1077 (citing *Lockyer v. Andrade*, 538 U.S. 63, 73-74 (2003) (describing sentence for which parole was possible at age 87 as "materially distinguishable" from a life without parole sentence)).

**B. <u>State Court of Appeal Opinion</u>**

The Court of Appeal denied Petitioner's claim that his sentence violated the constitutional guarantee against cruel and unusual punishment:

> [Petitioner] alleges his indeterminate sentence of 40 years to life in prison is the "functional equivalent" of life without the possibility of parole, which, given that he was a 17-year-old juvenile at the time of the offense, violates the constitutional guarantee against cruel and unusual punishment. He maintains this position even while acknowledging that the trial court found him eligible for parole after serving 25 years of his sentence, as required by the provisions of section 3051. We find the claim to be meritless.
>
> As used in the Eighth Amendment to the federal Constitution, the phrase "cruel and unusual punishments" refers to "extreme sentences that are 'grossly disproportionate' to the crime." (*Harmelin v. Michigan* (1991) 501 U.S. 957, 1001.) The California Constitution forbids cruel or unusual punishment (Cal. Const., art. I, § 17.), which precludes a sentence that is "'so disproportionate to the crime for which it is inflicted that it shocks the conscience and offends fundamental notions of human dignity.'" (*People v. Carmony* (2005) 127 Cal.App.4th 1066, 1085, quoting *In re Lynch* (1972) 8 Cal.3d 410, 424.) Appellant's claim is based on a line of cases dealing with the constitutional limits of punishment for juvenile offenders, particularly *Miller v. Alabama* (2012) 567 U.S. __ [132 S.Ct. 2455] (*Miller*). The *Miller* case holds it is cruel and unusual to impose a mandatory sentence of life without parole for a homicide committed prior to the defendant's 18th birthday, and requires that sentencing courts be given discretion to consider the juvenile offender's age and youthful characteristics before ordering such punishment. (*Miller*, *supra*, 567 U.S. at p. __ [132 S.Ct. at p. 2475].) [Petitioner] also tries to borrow a concept from *People v. Caballero* (2012) 55 Cal.4th 262, which holds that sentencing a juvenile offender for a nonhomicide offence to a term of years with a parole eligible date that falls outside of his or her natural life

26

expectancy is the "functional equivalent" of life without the possibility of parole and therefore unconstitutional. (*Id*. at pp. 267-268.)

[Petitioner's] argument is flawed at the outset by the notion that a sentence of 40 years to life imposed against a 17-year-old defendant constitutes a de facto sentence of life without the possibility of parole. He cites no evidence or authority for the implied contention that his life expectancy is less than or equal to 57 years, and has no other basis for challenging the constitutionality of his sentence. (See *People v. Villegas* (2001) 92 Cal.App.4th 1217, 1230-1231 [upholding sentence of 40 years to life for 17-year-old gang member convicted of premeditated attempted murder with a firearm enhancement]; see also, *People v. Martinez* (1999) 76 Cal.App.4th 489, 494 ["Only in the rarest of cases could a court declare that the length of a sentence mandated by the Legislature is unconstitutionally excessive."].) Moreover, under section 3051, subdivision (b)(3), "[a] person who was convicted of a controlling offense that was committed before the person had attained 23 years of age and for which the sentence is a life term of 25 years to life shall be eligible for release on parole by the [Board of Parole Hearings] during his or her 25th year of incarceration at a youth offender parole hearing . . . ." Accordingly, [Petitioner] will be eligible for release at the age of 42. We perceive no constitutional barriers to the sentence imposed by the trial court.

*Hernandez*, (F069377), at 26-28.

## C. Denial of Petitioner's Cruel and Unusual Punishment Claim Was Not Objectively Unreasonable

Petitioner contends that pursuant to the California Supreme Court's decision in *Franklin*, he must be given a "sufficient opportunity to put on the record 'the kinds of information that section 3051 or 4801[4] deem relevant at a youthful parole hearing.'" (Doc. 1 at 37.)

In *Franklin*, the California Supreme Court held that where a juvenile defendant is presumptively eligible for a youth offender parole hearing under California Penal Code § 3051, the defendant is not serving the functional equivalent of life without the possibility of parole and thus *Miller* does not apply. 63 Cal.4th at 280. However, the Court found that it was not clear in the

---

[4] Pursuant to California Penal Code § 4081(c),

[w]hen a prisoner committed his or her controlling offense, as defined in subdivision (a) of Section 3051, prior to attaining 23 years of age, the board, in reviewing a prisoner's suitability for parole pursuant to Section 3041.5, shall give great weight to the diminished culpability of juveniles as compared to adults, the hallmark features of youth, and any subsequent growth increased maturity of the prisoner in accordance with relevant case law.

case whether the defendant had an opportunity "to put on record the kinds of information that sections 3051 and 4801 deem relevant at a youth offender parole hearing. Thus, although [petitioner] need not be resentenced . . ., [and his] two consecutive 25-year-to-life sentences remain valid," the California Supreme Court remanded "the matter to the trial court for a determination of whether [petitioner] was afforded sufficient opportunity to make a record of information relevant to his eventual youth offender parole hearing." *Id*.

Petitioner asks the Court to provide him the "relief prescribed in the *Franklin* opinion as a means of preserving the constitutionality of California's sentencing scheme." (Doc. 1 at 37.) In other words, Petitioner is asking the Court to provide him "the post-conviction hearing which *Franklin* mandates." *Id*. at 37-38.[5]

Petitioner requests that the Court to provide him a hearing based on a state court's interpretation of a state statute. Federal habeas relief is available to state prisoners to correct violations of the United States Constitution, federal laws, or treaties of the United States. 28 U.S.C. § 2254(a). Federal habeas relief is not available to retry state law issues that do not rise to the level of a federal constitutional violation. *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991). "[A]lleged errors in the application of state law are not cognizable in federal habeas corpus." *Langford v. Day*, 110 F.3d 1380, 1389 (9th Cir. 1996) (citing *Middleton v. Cupp*, 768 F.2d 1083, 1085 (9th Cir. 1985)). Because Petitioner has not stated a federal claim, the Court recommends denying the claim.

Further, because Petitioner is eligible for a parole hearing after serving 25 years, his sentence is not equivalent to a life without parole sentence. *See Dermirdjian*, 832 F.3d at 1077 (sentence that made juvenile eligible for parole when he was 66 years old was not functionally

---

[5] Petitioner did not raise this specific claim during his state court of appeal because the *Franklin* case had not been decided before Petitioner's petition for review with the California Supreme Court was pending. (Doc. 17 at 12-13.) The Court will address Petitioner's claim, because "it is perfectly clear that the applicant does not raise [ ] a colorable federal claim." *Cassett v. Stewart*, 406 F.3d 614, 624 (2005).

equivalent to a life without parole sentence.)  Therefore, his sentence does not violate Supreme Court precedent.

## V.    <u>Certificate of Appealability</u>

A petitioner seeking a writ of habeas corpus has no absolute entitlement to appeal a district court's denial of his petition, but may only appeal in certain circumstances.  *Miller-El v. Cockrell*, 537 U.S. 322, 335-36 (2003).  The controlling statute in determining whether to issue a certificate of appealability is 28 U.S.C. § 2253, which provides:

(a) In a habeas corpus proceeding or a proceeding under section 2255 before a district judge, the final order shall be subject to review, on appeal, by the court of appeals for the circuit in which the proceeding is held.

(b)  There shall be no right of appeal from a final order in a proceeding to test the validity of a warrant to remove to another district or place for commitment or trial a person charged with a criminal offense against the United States, or to test the validity of such person's detention pending removal proceedings.

(c)    (1) Unless a circuit justice or judge issues a certificate of appealability, an appeal may not be taken to the court of appeals from—

(A)  the final order in a habeas corpus proceeding in which the detention complained of arises out of process issued by a State court; or

(B)  the final order in a proceeding under section 2255.

(2)  A certificate of appealability may issue under paragraph (1) only if the applicant has made a substantial showing of the denial of a constitutional right.

(3)  The certificate of appealability under paragraph (1) shall indicate which specific issues or issues satisfy the showing required by paragraph (2).

If a court denies a habeas petition, the court may only issue a certificate of appealability "if jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further."  *Miller-El*, 537 U.S. at 327; *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).  Although the petitioner is not required to prove the merits of his case, he must demonstrate "something more than the absence of frivolity or the existence of mere good faith on his . . . part."  *Miller-El*, 537 U.S.

at 338.

Reasonable jurists would not find the Court's determination that Petitioner is not entitled to federal habeas corpus relief to be debatable or wrong, or conclude that the issues presented required further adjudication. Accordingly, the Court recommends declining to issue a certificate of appealability.

## VI. Conclusion and Recommendation

Based on the foregoing, the undersigned recommends that the Court deny the Petition for writ of habeas corpus with prejudice and decline to issue a certificate of appealability.

These Findings and Recommendations will be submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C § 636(b)(1). Within **thirty (30) days** after being served with these Findings and Recommendations, either party may file written objections with the Court. The document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." Replies to the objections, if any, shall be served and filed within **fourteen (14) days** after service of the objections. The parties are advised that failure to file objections within the specified time may constitute waiver of the right to appeal the District Court's order. *Wilkerson v. Wheeler*, 772 F.3d 834, 839 ((9th Cir. 2014) (citing *Baxter v. Sullivan*, 923 F.2d 1391, 1394 (9th Cir. 1991)).


IT IS SO ORDERED.

Dated:   **September 21, 2018**                    /s/ *Sheila K. Oberto*
                                                                UNITED STATES MAGISTRATE JUDGE